Genova & Malin, Attorneys at Law
Thomas Genova
1136 Route 9
Wappingers Falls, New York 12590-4905
Telephone: (845) 298-1600
Facsimile: (845) 298-1265

and

MURPHY & KING, PROFESSIONAL CORPORATION
Harold B. Murphy
Andrew G. Lizotte
One Beacon Street
Boston, MA 02108
Telephone: (617) 423-0400
Facsimile: (617) 556-8985

Proposed Counsel for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MAJESTIC CAPITAL, LTD., | ) | Case No. 11-36225 |
| | ) | |
| Debtor. | ) | Joint Administration Pending |
| | ) | |
| In re: | ) | |
| | ) | |
| | ) | Chapter 11 |
| MAJESTIC USA CAPITAL, INC., | ) | Case No. 11-36221 |
| | ) | |
| Debtor. | ) | Joint Administration Pending |
| | ) | |
| In re: | ) | |
| | ) | |
| COMPENSATION RISK MANAGERS, | ) | Chapter 11 |
| LLC, | ) | Case No. 11-36226 |
| | ) | |
| Debtor. | ) | Joint Administration Pending |
| | ) | |

| | |
|---|---|
| In re: | ) |
| | ) |
| COMPENSATION RISK MANAGERS | ) Chapter 11 |
| OF CALIFORNIA, LLC | ) Case No. 11-36230 |
| | ) |
| Debtor. | ) Joint Administration Pending |
| | ) |
| In re: | ) |
| | ) |
| EIMAR, LLC, | ) Chapter 11 |
| | ) Case No. 11-36232 |
| | ) |
| Debtor. | ) Joint Administration Pending |
| | ) |
| In re: | ) |
| | ) |
| EMBARCADERO INSURANCE | ) Chapter 11 |
| HOLDINGS, INC., | ) Case No. 11-36234 |
| | ) |
| Debtor. | ) Joint Administration Pending |
| | ) |

## AFFIDAVIT OF JAMES SCARDINO PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, James Scardino declare as follows:

1. I am the Chief Executive Officer of Majestic Capital, Ltd. ("Majestic Capital"), Majestic USA Capital, Inc. ("Majestic USA"), Compensation Risk Managers, LLC ("CRM"), Compensation Risk Managers of California, LLC ("CRM CA"), Eimar, LLC ("Eimar"), and Embarcadero Insurance Holdings, Inc. ("Embarcadero") (each a "Debtor" and, collectively, the "Debtors") and have served in this capacity for approximately two years. I am familiar with the business and affairs of the Debtors.

2. I submit this declaration (the "Declaration") pursuant to Rule 1007 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy

Rules") to support the Debtors' petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") filed on April 29, 2011 (the "Petition Date") in these Chapter 11 cases and the relief in the form of the motions and applications that the Debtors have simultaneously requested of the Court.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by other members of the Debtors' management or professionals, upon information learned from my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If called as a witness, I would testify to the facts set forth in this Declaration. Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis. The Debtors have not yet prepared their schedules and statement of financial affairs, and the completion of such schedules and statements may result in modifications to any amounts or descriptions set forth herein. I am authorized to submit this Declaration.

4. Section I of this affidavit provides a brief background for the Debtors, Twin Bridges, Ltd. ("Twin Bridges") and Majestic Insurance Company ("Majestic Insurance" and, together with the Debtors and Twin Bridges, the "Majestic Entities"). Section II provides historical background for the Majestic Entities, including an explanation as to the causes of the financial distress and ultimate Chapter 11 filings. Section III supplements this information by providing a summary of the assets, liabilities, and capital structure for the Majestic Entities. Section IV describes the proposed sale of a substantial portion of the assets of Majestic Insurance pursuant to a pending California state court insolvency proceeding, and the impact of the California proceeding upon the

Debtors' Chapter 11 cases. Section V describes the status of Twin Bridges, alternatives for administering its assets, and the impact of its liquidation upon the Chapter 11 cases. Section VI summarizes the objectives of these Chapter 11 cases, and Section VII provides information respecting compliance with the Local Bankruptcy Rules.

## I.   THE DEBTORS AND THEIR AFFILIATES

5. The Debtors commenced these cases by filing voluntary Chapter 11 petitions on April 29, 2011.

6. The Debtors continue to operate as debtors-in-possession pursuant to 11 U.S.C. §§1107, 1108.

7. Majestic Capital, a holding company and the parent company of the Majestic Entities, is a publicly held corporation formed in Bermuda, and trading on the NASDAQ exchange under the symbol "MAJC". Majestic Capital's officers are based in New York. Majestic Capital has two wholly owned subsidiaries, Majestic USA and Twin Bridges, a Bermuda based reinsurance company. Twin Bridges and Majestic Insurance, a downstream subsidiary of Majestic USA, are the two principal insurance companies.

8. Majestic USA is a Delaware corporation wholly owned by Majestic Capital and headquartered in Poughkeepsie, New York. Majestic USA is the parent company for Majestic Capital's United States operations. Majestic USA has five (5) direct subsidiaries, four (4) of which are debtors in this case: Embarcadero, CRM, CRM CA, and Eimar. Majestic USA has seven employees performing legal, accounting, and administrative support, and is the only Debtor with employees.

9. Embarcadero is a California corporation with a principal place of business in San Francisco, California. Embarcadero serves primarily as a holding company for

Majestic Insurance.

10. CRM is a New York limited liability company that served as group administrator and third party claims administrator for eight (8) self-insured workers' compensation trusts, providing fee-based management services, including general management, underwriting, risk assessment, general recordkeeping, regulatory compliance service, safety and loss control services, and claims management services. CRM discontinued its operations on or about September 8, 2008.

11. CRM CA is a California limited liability company wholly owned by Majestic USA. CRM CA was also in the business of providing fee-based management services to self-insured groups. It ceased providing administrative services to its last self-insured group under management on or about December 31, 2010.

12. Eimar is a New York limited liability company wholly owned by Majestic USA. Eimar was a provider of medical bill review and case management services. In conjunction with CRM's termination of the New York self-insured groups, Eimar ceased operations on or about September 8, 2008. The medical bill review functions were transitioned initially to Majestic Insurance and then to third party providers in the third quarter of 2009.

13. Majestic Insurance is a California domiciled insurance company and a specialty provider of workers' compensation insurance products providing coverage in at least sixteen (16) states, including New York, New Jersey, California, and Arizona.

14. Twin Bridges is a Bermuda based reinsurance company, which primarily provides reinsurance coverage to policies issued by Majestic Insurance.

15. Majestic Insurance and Twin Bridges are not eligible to be debtors because of

their status as insurance companies, pursuant to 11 U.S.C. §109.

## II.  HISTORY OF THE MAJESTIC ENTITIES

### A.  Formation of the Majestic Entities

16. The Majestic Entities began business in 1999 through the formation of CRM. CRM was established to manage and operate workers' compensation self-insured groups in New York.  Eimar was formed in 2001 to provide medical billing support for CRM. CRM CA was established in 2003 to provide similar workers' compensation insurance services in the State of California.  CRM CA originally formed and managed six (6) workers' compensation self-insured groups in the California market.  Twin Bridges was also formed in 2003 to underwrite reinsurance on a portion of the excess and frequency workers' compensation coverage purchased by the self-insured groups managed by CRM.

17. Majestic Capital was formed in September 2005 to serve as a holding company.  In December 2005, Majestic Capital completed its initial public offering. Pursuant to the offering, Majestic Capital sold 6,000,000 shares of common stock and raised $68,700,000, net of underwriting and offering expenses.  Of this amount, approximately $47,000,000 was distributed to Twin Bridges to support the growth of the reinsurance business, and $6,500,000 was distributed to CRM to satisfy an existing credit facility and for working capital purposes.

18. Majestic USA was incorporated in Delaware in December 2005 to serve as the parent entity for the United States operations.

19. In November 2006, Majestic USA acquired Embarcadero, which was the sole shareholder of Majestic Insurance, for the sum of approximately $46,000,000.  Majestic USA issued approximately $36,000,000 in debentures, guaranteed by Majestic Capital, to

fund the acquisition. Majestic USA contributed $5,000,000 to the capital of Majestic Insurance following the acquisition. After the acquisition of Majestic Insurance, Twin Bridges began providing Majestic Insurance with reinsurance coverage.

**B. Discontinuation of Operations for Three of the Debtors**

20. As set forth above, during the past four years, CRM, CRM CA, and Eimar have discontinued operations.

21. <u>CRM/Eimar</u>: The self-insured group product offered in New York was not as attractive during periods of low premium rates and excess underwriting capacity because of the risks associated with the joint and several liability of the group members. Increased market competition and pricing pressure, combined with the underfunded status of the self-insured groups, motivated the New York self-insured groups to voluntarily terminate their active operations during the second half of 2007 and first quarter of 2008. Remediation of underfunded status of the groups was made impracticable because of significant reductions in the workers' compensation rates set by the New York State Workers' Compensation Board (the "Workers Comp Board"), increased market competition and pricing pressures, past and anticipated member attrition, regulatory restrictions on discounts offered to the members, and regulatory restrictions on adding new members. As of September 2008, CRM ceased to manage any self-insured groups in New York. CRM transferred administration of the claims for all of the self-insured groups to third party administrators appointed by the Workers Comp Board. In connection with the voluntary termination of the New York self-insured groups, Eimar ceased operations as, historically, the majority of Eimar's business was derived from the New York self-insured groups managed by CRM.

22. <u>CRM CA</u>: During 2006, the California group that provided workers' compensation insurance to plastic manufacturers ceased operations and disbanded, in large part due to declines in the California plastics industry. During 2008 and 2009, three of the self-insured groups under management (automobile dealers, wineries, and contractors) decided to cease active business operations and enter run-off as the groups were unable to obtain adequate bonding coverage to meet the surety requirements of the California Department of Industrial Relations. Further, in the soft market conditions experienced in California, primary insurance carriers offering guaranteed cost products presented a competitive alternative to the risk product offered by CRM CA's self-insurance groups. During 2009 and 2010, the remaining two groups under management, banking and healthcare, elected to move to new groups administrators, and CRM CA ceased operations in 2010.

## C. Majestic Insurance

23. Majestic Insurance entered the New York and New Jersey primary workers' compensation insurance markets in 2007. Its decision to expand into New York and New Jersey, and to aggressively grow its California business in 2007 and 2008, resulted in an expansion into riskier industries and classes of business and lowering certain of its underwriting and pricing standards. Majestic Insurance was also impacted by downward trends in workers' compensation premium rates in New York and California as a result of legislative reforms. Despite corrective underwriting actions taken commencing in 2008, the resulting unfavorable current year loss reserve trends and adverse development of prior year losses beginning in fiscal year 2009 contributed to the declining financial condition of Majestic Insurance.

24. Majestic Insurance has also been materially and adversely impacted by litigation and governmental investigations directed toward the Majestic Entities commencing in 2008.

25. In March 2008, the New York State Office of the Attorney General ("NY Attorney General") advised CRM that it had commenced an investigation of CRM relating to its administration of the Healthcare Industry Trust of New York. Subsequent inquiries indicated a focus on CRM's initial public offering in December 2005. In December 2009, the Majestic Entities received a "Notice of Imminent Enforcement Action" from the NY Attorney General, indicating an intent to file civil claims against, among others, CRM, Majestic Insurance, and certain directors and officers to redress allegedly unlawful practices relating to the administration and marketing of workers' compensation group self-insurance trusts in New York and in connection with the initial public offering.

26. In December 2009, the Workers Comp Board commenced an action against CRM, Majestic Capital, Majestic Insurance and numerous affiliated entities on its own behalf and in its capacity as successor in interest to seven (7) New York self-insured groups, alleging, among other things, breach of fiduciary duty to the self-insured groups and breach of contract in connection with the premiums charged on individual stop loss and aggregate excess coverage.

27. As a result of the litigation initiated by the NY Attorney General and the Workers Comp Board, the credit rating of Majestic Insurance was downgraded from A- to B++. To address the downgrade of its A.M. Best rating, on or about April 1, 2010, Majestic Insurance entered into a strategic alliance through a quota share agreement with

AmTrust North America, Inc. ("AmTrust"), an A rated insurer, pursuant to which AmTrust authorized Majestic Insurance to issue insurance policies of AmTrust affiliated insurers, subject to Majestic Insurance's agreement to reinsure substantially all of the claims under those policies. This arrangement, commonly referred to as a "fronting" arrangement, allowed Majestic to retain a significant portion of insurance business with customers that were required to contract only with "A" rated carriers. While the arrangement with AmTrust minimized the potential loss of customers, it had an adverse impact upon the total premium revenue of Majestic Insurance.

28. In addition, the Majestic Entities began to explore sale or merger opportunities and, in this regard, the Majestic Entities retained the investment banking firm of Macquarie Capital. On September 21, 2010, Majestic Capital entered into a merger agreement with Bayside Capital Partners, LLC ("Bayside"). The merger, if it had been consummated, would have provided the Majestic Entities with access to increased capitalization. Bayside withdrew from the merger agreement, however, on or about March 21, 2011, citing deterioration in the financial condition of Majestic Insurance and related factors. After the merger agreement was terminated, the A.M. Best credit rating of Majestic Insurance was further downgraded to B, which further damaged Majestic Insurance's ability to maintain the viability of its business.

29. In addition to the Bayside merger efforts and the fronting arrangement with AmTrust, the Majestic Entities took additional actions to address the cash flow constraints arising from the operating losses at Majestic Insurance and the winddown of other affiliates' operations. The Majestic Entities effectuated a substantial reduction in force in early 2011, and Majestic Capital secured approval from the Bermuda Monetary

Authority for a distribution of additional surplus from Twin Bridges. These efforts did alleviate some of the prepetition financial distress but were insufficient to prevent the filing of the petitions.

30. As a result of the failure of the merger with Bayside, the further downgrading in the credit rating of Majestic Insurance, and the continuing operating losses suffered by Majestic Insurance, the Insurance Commissioner for the State of California elected to place Majestic Insurance into involuntary conservatorship on April 21, 2011, as more fully set forth in Section IV herein.

## III. ASSETS AND LIABILITIES OF THE MAJESTIC ENTITES

### Assets and Liabilities of the Debtors

### A. Majestic Capital

31. The principal assets of Majestic Capital are its one hundred percent (100%) ownership interest in Twin Bridges and its indirect one hundred percent (100%) ownership interest in Majestic Insurance. Majestic Capital anticipates there to be a surplus available from the liquidation of both Majestic Insurance and Twin Bridges, as more fully set forth in Sections V and VI herein. In addition to its interest in the two insurance companies, Majestic Capital's principal assets include cash in the approximate amount of $3,300,000, various items of personalty, causes of action, and other intangible

assets of indeterminate value.

32. With respect to liabilities, Majestic Capital has guaranteed approximately $36,000,000 in debentures issued by Majestic USA, as further set forth below. Majestic Capital has approximately $900,000 in other fixed indebtedness, consisting principally of unpaid fees and expenses owing to professional persons. Majestic Capital is also a defendant, along with other Majestic Entities, in various pending litigation matters as set forth in Exhibit B hereto.

33. Attached hereto as Exhibit C, pursuant to Local Bankruptcy Rule 1007-2, is a summary of the number and classes of stock or other securities of Majestic Capital that are publicly held, and the number of holders thereof, listing separately those held by each of the company's officers and directors and the amounts so held.

**B. Majestic USA**

34. Majestic USA's principal asset is its one hundred percent (100%) ownership interest in Embarcadero, which is in turn the sole owner of Majestic Insurance. In addition to its indirect ownership interest in Majestic Insurance, Majestic USA has a one hundred percent (100%) ownership interest in the nonoperating entities, CRM, CRM CA, and Eimar. Majestic USA's other assets include cash in the approximate amount of $710,000, its rights under a lease and license agreement to occupy its headquarters, causes of action, various items of personalty, and other intangible assets having indeterminate value. The books and records for Majestic USA and its subsidiaries are kept in Poughkeepsie, New York.

35. Indenture: In connection with its acquisition of Embarcadero in November 2006, on or about November 14, 2006, Majestic USA entered into an Indenture (the

"Indenture") of Junior Subordinated Debt Securities, with Bank of New York Trust Company serving as trustee (the "Indenture Trustee"). Majestic USA formed the Majestic USA Holdings Trust I, formerly known as the CRM Holdings Trust I (the "Trust") pursuant to an Amended and Restated Declaration of Trust (the "Indenture Trust") dated November 14, 2006 as a Delaware statutory trust subsidiary to issue the securities. Pursuant to the Indenture, the Indenture Trust, and the related Debenture Subscription Agreement and Capital Securities Purchase Agreements, the Trust sold approximately $36,000,000 in debentures to Bear Stearns, Alesco Preferred Funding 11 and Alesco Preferred Funding 12. Majestic Capital guaranteed the repayment of the debentures. The outstanding balance owing on the debentures is approximately $41,000,000.

36. Majestic USA is also a defendant in the litigation matters set forth in Exhibit B hereto.

### C. Embarcadero Holdings

37. The principal asset of Embarcadero is its one hundred percent (100%) ownership interest in Majestic Insurance. In addition to its interest in Majestic Insurance, Embarcadero's assets include cash in the amount of approximately $1,000, potential causes of action, miscellaneous tangible personal property, and other intangible assets of indeterminate value.

38. With respect to liabilities, in May 2003, Embarcadero entered into a trust indenture with Wilmington Trust Company, as indenture trustee, pursuant to which Embarcadero issued $8,000,000 in debt securities to Wells Fargo Bank in order to increase the statutory surplus of Majestic Insurance. The outstanding balance of this

indebtedness is approximately $8,000,000. Embarcadero is also a defendant in the litigation matters set forth in Exhibit B hereto.

### D. Eimar

39. Eimar is wholly owned by Majestic USA. It is nonoperating, has virtually no assets and its only known liabilities are the potential claims against it as a codefendant in the litigation matters set forth in Exhibit B hereto.

### E. CRM

40. CRM is wholly owned by Majestic USA and is nonoperating. Its assets include cash of approximately $9,000, its interest in several leases of tangible personal property, causes of action (including a loan receivable from a former employee in the approximate amount of $300,000), and other intangible assets having an indeterminate value. Its only known liabilities are the potential claims against it as a codefendant in the litigation matters set forth in Exhibit B hereto.

### F. CRM CA

41. CRM CA is wholly owned by Majestic USA and is nonoperating. Its assets include cash and prepaid assets (principally insurance) having a value of approximately $70,000, causes of action, and other intangible assets having indeterminate value. Its only known liabilities are the potential claims against it as a codefendant in the litigation matters set forth in Exhibit B hereto.

## Assets and Liabilities of the Nondebtor Affiliates

### G. Majestic Insurance Company

42. As of December 31, 2010, Majestic Insurance had short term investments, cash and cash equivalents totaling approximately $275,000,000. Its other principal asset

was reinsurance recoverable and prepaid reinsurance in the approximate amount of $163,000,000. Majestic Insurance Company had reserves for losses and loss adjustment expenses of $314,000,000 and accrued reinsurance payable of $62,000,000. The Insurance Commissioner for the State of California has asserted that the loss reserves on the books of Majestic Insurance are understated by an amount in excess of $40,000,000.

### H. Twin Bridges

43. As of December 31, 2010, Twin Bridges had cash and cash equivalents of approximately $9,000,000 and short term investments of $3,700,000. Additionally, Twin Bridges had approximately $32,000,000 in premiums receivable on account of its reinsurance of coverage initiated by Majestic Insurance. The principal liability of Twin Bridges was a reserve for losses on accounts of its reinsurance obligations in the estimated amount of $31,000,000. Twin Bridges had shareholder's equity, on a book value basis, of approximately $14,000,000 as of December 31, 2010. In the first quarter of 2011, Twin Bridges, with the consent of the Bermuda Monetary Authority, returned $7,000,000 in surplus to Majestic Capital.

### IV. COMMENCEMENT OF CONSERVATORSHIP AND PROPOSED SALE OF MAJESTIC INSURANCE TO AMTRUST

44. On April 21, 2011, Majestic Insurance was placed into conservatorship (the "Conservation Proceeding") by Dave Jones, the Insurance Commissioner for the State of California, acting in his capacity as conservator (the "Conservator") based upon an alleged reserve and premium deficiency of more than $46,000,000. As a consequence thereof, title to the assets of Majestic Insurance vested in the Conservator, and the Conservator was authorized to operate Majestic Insurance's business in conservation.

45. As a result of its ongoing fronting arrangement with Majestic Insurance,

AmTrust, one of the twenty (20) largest workers' compensation writers in the United States, expressed an interest in purchasing the assets and assuming a substantial portion of the liabilities of Majestic Insurance. AmTrust also expressed a willingness to assume, through a loss portfolio transfer reinsurance agreement, all workers' compensation claim liabilities on Majestic Insurance policies without an aggregate limit or cap on the amount of loss reinsured.

46. On April 21, 2001, a Rehabilitation Agreement was executed by and among the Conservator, AmTrust, and Security National Insurance Company (the "Rehabilitation Agreement"). In addition to the Rehabilitation Agreement, the parties also entered into a Renewal Rights and Asset Purchase Agreement (the "Renewal Rights Agreement"), a Loss Portfolio Transfer and Quota Share Reinsurance Agreement (the "Reinsurance Agreement"), and a Reinsurance Administrative Services Agreement (the "Services Agreement" and, together with the Rehabilitation Agreement, the Renewal Rights Agreement, and the Reinsurance Agreement, the "Agreements").

47. Pursuant to the Renewal Rights Agreement, the Conservator has agreed to sell and assign Majestic Insurance's primary insurance operating assets to AmTrust, subject to approval of the Superior Court for the State of California where the Conservation Proceeding is pending (the "Conservation Court"). These assets include, among other things, all of the systems, data, books and records, broker and vendor relationships, intellectual property, certain office leases, staffing resources, and other business assets necessary to: (a) administer the Majestic Insurance claims; (b) administer and service the in-force policies; and (c) provide renewal insurance policies to Majestic Insurance customers as their policies expire.

48. AmTrust will also acquire the exclusive right to offer renewal policies to Majestic Insurance's current customers. In consideration for these rights, AmTrust has agreed to reinsure and pay all workers' compensation claims under existing policies without aggregate limit and will pay a profit share commission to the Conservator on a graduated scale if certain specified loss ratio benchmarks are satisfied on Majestic Insurance policies after the closing date. AmTrust will not assume all liabilities of Majestic Insurance. Among the excluded liabilities are those arising from certain pending litigation matters, claims arising other than pursuant to the insurance policies, and claims for unpaid taxes, if any.

49. Pursuant to the Reinsurance Agreement, Majestic Insurance will transfer to an AmTrust insurance company affiliate (the "Reinsurer") assets equal to the sum of Majestic Insurance's reported statutory liabilities relating to policy obligations net of certain reinsurance, plus the sum of $26,000,000. In exchange, the Reinsurer will reinsure all workers' compensation claim liabilities under policies issued by Majestic Insurance, without aggregate limit or exclusion. The only potential insurance claims that will not be covered without limitation are claims, if any, under policies of insurance issued in and before the 1970's by Great Western Insurance Company, an insurer acquired by Majestic Insurance in the 1970's. AmTrust has agreed to cover such claims up to $1,000,000 should they arise. Majestic Insurance does not anticipate any exposure under these policies in excess of the stated limit.

50. Pursuant to the Services Agreement, AmTrust has agreed to provide any and all claims administration fees necessary to the timely adjustment and payment of claims, without charging any service fees to Majestic Insurance. Such administrative services

shall include premium collection and claims, and policy and outward reinsurance administration.

51. The Agreements will result in policyholder liabilities under Majestic Insurance policies being reinsured by a stable, adequately capitalized entity. Claims under Majestic Insurance policies will be reinsured without an aggregate cap on the amount of policy benefits that AmTrust will be required to pay to fully satisfy claims covered by Majestic Insurance policies, subject to the apparently small risk of claims in excess of $1,000,000 relating to the Great Western policies.

52. AmTrust also has proposed to offer employment opportunities for the majority of the Majestic Insurance employees.

53. The Conservator has estimated that, absent material deterioration in the assets of Majestic Insurance or an unexpected increase in liabilities, the closing of the sale to AmTrust should leave the Majestic Insurance conservation estate with at least $15,000,000 in residual assets to be available toward expense of administration, satisfaction of general creditor claims, and distribution to the Debtors.

54. The Debtors estimate that Majestic Insurance has approximately $2,300,000 of fixed, non-insurance related claims that may be payable from the surplus. Prior to distribution of the surplus, the Conservator would need to resolve claims against Majestic Insurance in connection with several pending litigation matters, as further set forth in Exhibit B hereto. While the Debtors believe that the claims asserted against Majestic Insurance in the pending litigation are grossly overstated, the timing and amount of a distribution of surplus to the Debtors cannot be determined at this time and will be impacted by any allowance of those claims in the Conservation Proceeding. The Debtors

also intend to explore avenues for monetizing their interest in Majestic Insurance in order to accelerate a recovery from the Debtors' interest in Majestic Insurance and its net operating losses and other intangible assets.

55. A hearing is presently scheduled before the Conservation Court on approval of the Agreements for June 2, 2011. Responses to the proposed sale must be filed by May 16, 2011.

56. The Debtors understand that a closing will likely occur several weeks after the sale hearing, assuming that the proposed transaction is approved.


## V.    TWIN BRIDGES

57. Twin Bridges is no longer writing reinsurance policies. Its business operations consist of administering reinsurance coverage for existing policies written by Majestic Insurance. Consequently, the liquidation of its assets and distribution of any surplus to Majestic Capital will arise as a result of the Conservation Proceeding.

58. As of the Petition Date, the total surplus of Twin Bridges was approximately $7,000,000. Before any surplus becomes available to the Debtors, Twin Bridges will be required to (i) satisfy claims arising from the reinsurance coverage for policies written by Majestic Insurance, (ii) make payment of any amounts owing to Majestic Insurance to fund reserves, and (iii) pay any non-insurance related claims arising from operations. The net surplus would be further subject to resolution of claims against Twin Bridges arising from several pending litigation matters, as further set forth in Exhibit B hereto. As with Majestic Insurance, the Debtors believe that the amounts asserted in the pending litigation

against Twin Bridges are grossly overstated. The amounts chargeable against the surplus on account of such litigation, however, cannot be ascertained at this time.

59. Based upon the available information, there appears to be a reasonable likelihood that a surplus will be available to the Debtors from the winddown of Twin Bridges. The available surplus may not be available for an extended period of time if the Debtors are required to wait for existing policies to run off. Distribution of a surplus could be significantly expedited if the Twin Bridges portfolio were disposed of pursuant to a loss portfolio transfer or commutation of claims, which the Debtors intend to explore during these proceedings.

## VI. OBJECTIVES OF THE PROCEEDINGS

60. The purpose of these proceedings is: (i) to facilitate and support the Conservation Proceeding so as to preserve a potential surplus for the Debtors; (ii) to support the winddown of Twin Bridges as necessary to preserve a potential surplus for the Debtors; (iii) to pursue avenues to monetize the Debtors' interest in Majestic Insurance and Twin Bridges; (iv) to resolve disputed claims; and (v) to obtain confirmation of a liquidating plan of reorganization that will provide an effective mechanism for the distribution of the Debtors' assets to their respective creditors.

61. During the Conservation Proceeding and until the proposed sale transaction closes, the Debtors intend to provide necessary support to the Conservator, including the Debtors' computer systems and access to the Debtors' records and personnel. The Debtors are working to reach an agreement with the Conservator respecting reimbursement for costs associated with these services. Once the proposed transaction

has closed, the Debtors may be asked to provide transitional support to AmTrust. With respect to Twin Bridges, the Debtors intend to pursue a loss portfolio transfer or commutation of claims in order to monetize their interest in Twin Bridges. The Debtors also intend to retain an investment banker to assist in evaluating strategies for monetizing the Debtors' interest in Majestic Insurance and Twin Bridges.

62. The Debtors will provide information and support to the Conservator with respect to disputed claims asserted against Majestic Insurance so as to enhance the prospects for a distribution of surplus. Similarly, the Debtors will support Twin Bridges in the resolution of its disputed claims. Many of the claims against Majestic Insurance and Twin Bridges, as well as those against the Debtors, may be covered, in whole or in part, by existing insurance policies, or may be subject to subordination to holders of allowed unsecured claims, to the extent such claims are for damages arising from the purchase of the securities of Majestic Capital, pursuant to 11 U.S.C. §510(b). The claims against the Debtors arise from pending litigation of which existing management has substantial knowledge, thereby making the Debtors well suited to assist in the resolution of these claims.

63. In connection with the orderly winddown of their business affairs, the Debtors also intend to take those steps necessary to preserve books and records, file necessary tax returns, and to submit any reporting required by regulatory agencies, particularly given Majestic Capital's position as a publicly held company.

64. The Debtors believe that the foregoing measures will best serve the objectives of achieving an orderly winddown of the Debtors' assets within a reasonable time frame and maximizing the recovery from the Debtors' assets for the benefit of creditors.

## VII. COMPLIANCE WITH LOCAL BANKRUPTCY RULE 1007-2

65. Attached as Exhibits E and F hereto, in accordance with Local Bankruptcy Rule 1007-2, are the following:

(i) a listing of the individuals who comprise the senior management of the Debtors, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience;

(ii) the estimated amount of the weekly payroll to employees (exclusive of officers, directors, shareholders or partners) for the thirty (30) day period following the filing of the Chapter 11 petitions;

(iii) the amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the Chapter 11 petitions to officers, shareholders, and directors; and

(iv) a schedule for the thirty (30) day period following the filing of the petitions of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

Attested to this 2nd day of May, 2011

/s/ James Scardino
James Scardino, Chief Executive Officer

594521